**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 710 | : : : | |
| Plaintiff, | : : | |
| v. | : : | Case No. |
| QUALITY CUSTOM DISTRIBUTION | : : : | |
| Defendant. | : : | |

## COMPLAINT TO CONFIRM AND ENFORCE ARBITRATION AWARD

Plaintiff International Brotherhood of Teamsters, Local 710 ("Local 710" or "the Union"), by its undersigned counsel, hereby brings this action against Defendant Quality Custom Distribution ("QCD" or "the Company") to confirm and enforce the award of Arbitrator Peter R. Meyers that was rendered on December 21, 2020 in accordance with the parties' negotiated collective-bargaining agreement**.** In support thereof, Local 710 states as follows:

### NATURE OF THE ACTION

1.      This is an action pursuant to Section 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185, to confirm and enforce an arbitration award issued by Arbitrator Peter R. Meyers on December 21, 2020 ("the Award").

### PARTIES

2.      Plaintiff  Local 710 is a "labor organization" representing employees in an industry "affecting commerce" within the meaning of Sections 2(5), (6) and (7) of the National

Labor Relations Act (NLRA), 29 U.S.C. §§152(5), (6) and (7), and Section 301 of the LMRA, 29 U.S.C. §185. Its principal office is located at 9000 West 187th Street, Mokena, Illinois 60448.

3. Defendant QCD is a division of Golden State Foods, a Delaware corporation with a principal place of business in Irvine, California.

## JURISDICTION AND VENUE

4. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1331, in that the action arises under Section 301(c) of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185(c), which gives federal courts jurisdiction to hear suits over violations of collective bargaining agreements, including those challenging or seeking enforcement of arbitration awards issued pursuant to collective bargaining agreements.

5. Venue is proper under Section 301(a) of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185(a), because (a) Local 710 maintains its principal office within the Court's jurisdiction, and (b) Local 710's duly authorized officers or agents are engaged in representing or acting for employee members within the Court's jurisdiction.

## FACTUAL BACKGROUND

6. Quality Custom Distribution (the "Company") and International Brotherhood of Teamsters, Local No. 710 (the "Union") are parties to a collective bargaining agreement ("CBA") which is effective from June 1, 2019, through May 31, 2022, and which is attached as Exhibit A to the Complaint.

7. Article Eleven of the CBA (Exh. A at 11–13) provides for the arbitration of grievances arising under the CBA.

8. The CBA contains an hours-guarantee provision, Section 4.5, which provides:

> The parties agree that the top 80% of the current Seniority Roster shall be guaranteed 40 hours of work or its equivalent in pay, when reporting for

2

work. The remaining 20% of the current Seniority Roster shall not be guaranteed 40 hours and may be subject to call when needed on a daily basis. All Employees shall be guaranteed not less than 8 hours continuous work or its equivalent in pay (if on a 5 day schedule) or 10 hours or its equivalent in pay (if on a 4 day schedule) when called in or put to work with the exception of the 5th or 6th day, when a minimum daily guarantee of 4 continuous hours shall prevail at time and one-half the hourly rate. In the event of an "Act of God," the Employee shall not be guaranteed 40 hours for that week. The Employer, with a Union Member present, will notify the Employee's to not report to work. In the event there is limited work, available work will be offered in seniority order by classification.

Exh. A at 9

9.     On or about April 1, 2020, the Company reduced work hours across the board for its Union-represented employees from 40 hours per week to 30 hours per week.

10.     On or about April 17, 2020, the Union timely filed a grievance challenging the Company's unilateral implementation of this across-the-board hours reduction ("the Grievance"), which is attached as Exhibit B to the Complaint.

11.     The Grievance remained unresolved through the grievance process.

12.     As a result, in accordance with the terms of the CBA, the Union made a timely demand for arbitration.

13.     In accordance with the terms of the CBA, the parties selected Arbitrator Peter R. Meyers to hear the dispute.

14.     On September 29, 2020, Arbitrator Meyers conducted a hearing on the grievance via the Zoom videoconference platform, during which both parties presented evidence.  The parties then submitted written briefs to the Arbitrator.

15.     On December 21, 2020, Arbitrator Meyers issued his Decision and Award, which is attached as Exhibit C.

16.     The Arbitrator's Award sustained the grievance and directed the Company to pay the balance of the forty-hour guarantee to the affected employees throughout the applicable period.  (Exh. C at 20–21)  The Arbitrator retained jurisdiction for the limited purpose of resolving any disputes over the implementation of his Award.  (Exh. C at 21)

17.     Pursuant to the terms of Article Eleven, Section 11.4 of the CBA, the Award is final and binding on the Company, the Union, and the affected employees.

18.     The Company has not complied with the Award, nor has it gone to the Arbitrator to resolve any disputes over the implementation of the Award.

19.     Instead, the Company filed a Petition to Vacate the Arbitrator's Award on March 19, 2021.  This action is docketed as Quality Custom Distribution v. International Brotherhood of Teamsters, Local 710, Case No. 1:21-cv-01534, and is subject to a pending Motion to Dismiss filed by the Union on April 26, 2021.

20.     The Court is empowered to confirm labor arbitration awards under Section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, subject to a "very limited" review.  *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567 (1960); *Ameren Ill. Co. v. Int'l Brotherhood of Electrical Workers,* 906 F.3d 612, 616–17 (7th Cir. 2018) (citations omitted).  "As long as the arbitrator's award 'draws its essence from the [CBA],' and is not merely 'his own brand of industrial justice,' the award is legitimate."  *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1983) (quoting *United Steelworkers of Am.  v. Enterprise Wheel & Car Corp.*, 363 U. S. 593, 597 (1960)).

21.     The Arbitrator's Award turns on his interpretation and application of the "Act of God" exemption to the hours guarantee set forth in Section 4.5 of the CBA, and draws its essence from the CBA.

4

22.     The Arbitrator acted within his authority and jurisdiction conferred by the CBA.

23.     The Company's failure and refusal to abide by the Arbitrator's Award is unjustified and therefore the Union should be awarded its reasonable counsel fees and costs incurred in this action.

24.     As the damages from the breach of contract determined to have occurred are ascertainable with mathematical precision, prejudgment interest should be awarded.

WHEREFORE, International Brotherhood of Teamsters, Local 710 respectfully requests that the Court: 1) enter judgment on the Complaint in favor of the Union and against the Company; 2) confirm and enforce the Arbitrator's Award (Exh. C) and order the Company to take the actions required by the Award; and 3) award prejudgment interest, as well as the Union's attorneys' fees, costs, and such other relief as this Court may deem just and proper.

Respectfully submitted,

WILLIG, WILLIAMS & DAVIDSON

s/ Joseph D. Richardson
JOSEPH D. RICHARDSON, ESQUIRE
PA Bar Number 311147
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
(215) 656-3655
jrichardson@wwdlaw.com

JOHN R. BIELSKI, ESQUIRE
PA Bar Number 86790
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
(215) 656-3652
jbielski@wwdlaw.com

*Attorneys for Teamsters Local 710*

Dated:  May 11, 2021

# EXHIBIT A

| DPI | EXPIRES |
|---|---|
| **AGENT**: JOHN RULE | 05/31/2022 |



## COLLECTIVE BARGAINING AGREEMENT

### BETWEEN

# TEAMSTERS LOCAL 710

**HIGHWAY DRIVERS, DOCKMEN, SPOTTERS, RAMPMEN, MEAT, PACKINGHOUSE AND ALLIED PRODUCTS DRIVERS AND HELPERS, OFFICE WORKERS AND MISCELLANEOUS EMPLOYEES**

### AND

# DPI DEDICATED LOGISTICS

### FOR THE PERIOD

## JUNE 1, 2019 THROUGH MAY 31, 2022

# TEAMSTERS LOCAL UNION NO. 710

AN AFFILIATE OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS

UNION OFFICE · 9000 W. 187TH ST · MOKENA, IL 60448 · PHONE (773) 254-3200 · FAX (773) 254-4190 · ONLINE TEAMSTERS710.COM

# TABLE OF CONTENTS

**INTENT AND PURPOSE** ......................................................................................................... 1

**ARTICLE ONE - RECOGNITION** ........................................................................................... 1
Section 1.1 ............................................................................................................................. 1

**ARTICLE TWO - UNION SECURITY** ..................................................................................... 1
Section 2.1 - Union Shop .................................................................................................... 1
Section 2.2 ............................................................................................................................. 2
Section 2.3 ............................................................................................................................. 2
Section 2.4 ............................................................................................................................. 3
Section 2.5 ............................................................................................................................. 3
Section 2.6 ............................................................................................................................. 3
Section 2.7 - DRIVE .............................................................................................................. 3

**ARTICLE THREE - BARGAINING UNIT WORK** ................................................................. 3
Section 3.1 ............................................................................................................................. 3
Section 3.2 ............................................................................................................................. 3

**ARTICLE FOUR - MINIMUM RATE OF PAY** ....................................................................... 4
Section 4.1 ............................................................................................................................. 4
Section 4.2 ............................................................................................................................. 4
Section 4.3 ............................................................................................................................. 4
Section 4.4 ............................................................................................................................. 4
Section 4.5 ............................................................................................................................. 4
Section 4.6 - Jury Duty ....................................................................................................... 5
Section 4.7 - Funeral Leave ............................................................................................... 5

**ARTICLE FIVE - HOURS OF WORK, BREAKS AND OVERTIME** ...................................... 5
Section 5.1 ............................................................................................................................. 5
Section 5.2 ............................................................................................................................. 5
Section 5.3 ............................................................................................................................. 6
Section 5.4 ............................................................................................................................. 6
Section 5.5 ............................................................................................................................. 6
Section 5.6 ............................................................................................................................. 6

**ARTICLE SIX - HOLIDAYS** ................................................................................................... 6
Section 6.1 ............................................................................................................................. 6
Section 6.2 ............................................................................................................................. 7
Section 6.3 ............................................................................................................................. 7
Section 6.4 ............................................................................................................................. 7
Section 6.5 ............................................................................................................................. 7
Section 6.6 ............................................................................................................................. 7
Section 6.7 ............................................................................................................................. 7

**ARTICLE SEVEN - VACATIONS** ........................................................................................... 8
Section 7.1 ............................................................................................................................. 8
Section 7.2 ............................................................................................................................. 8
Section 7.3 ............................................................................................................................. 8
Section 7.4 ............................................................................................................................. 8

i

Section 7.5 ..................................................................................................................... 9
Section 7.6 ..................................................................................................................... 9

**ARTICLE EIGHT - PERSONAL AND SICK DAYS** ........................................................ **9**
Section 8.1 ..................................................................................................................... 9

**ARTICLE NINE - LEAVES OF ABSENCE** ..................................................................... **9**
Section 9.1 ..................................................................................................................... 9
Section 9.2 ................................................................................................................... 10
Section 9.3 ................................................................................................................... 10

**ARTICLE TEN - HEALTH AND WELFARE** ................................................................. **10**
Section 10.1 ................................................................................................................. 10
Section 10.2 ................................................................................................................. 10
Section 10.3 ................................................................................................................. 10
Section 10.4 ................................................................................................................. 11

**ARTICLE ELEVEN - RESOLUTION OF GRIEVANCES** ............................................... **11**
Section 11.1 - Discipline and Discharge ...................................................................... 11
Section 11.2 ................................................................................................................. 11
Section 11.3 - Cumulative Remedy .............................................................................. 12
Section 11.4 - Arbitration ............................................................................................ 12
Section 11.5 - Corrective Action Steps ........................................................................ 13

**ARTICLE TWELVE - UNION REPRESENTATION** ....................................................... **13**
Section 12.1 ................................................................................................................. 13
Section 12.2 ................................................................................................................. 14
Section 12.3 ................................................................................................................. 14
Section 12.4 ................................................................................................................. 14
Section 12.5 - Extra Contract Agreements ................................................................... 15

**ARTICLE THIRTEEN - SENIORITY** ........................................................................... **15**
Section 13.1 ................................................................................................................. 15
Section 13.2 ................................................................................................................. 15
Section 13.3 ................................................................................................................. 16
Section 13.4 ................................................................................................................. 16
Section 13.5 ................................................................................................................. 16
Section 13.6 ................................................................................................................. 16
Section 13.7 ................................................................................................................. 16

**ARTICLE FOURTEEN - HEALTH AND SAFETY** ........................................................ **17**
Section 14.1 ................................................................................................................. 17
Section 14.2 - Protective Clothing ............................................................................... 17
Section 14.3 ................................................................................................................. 17
Section 14.4 ................................................................................................................. 17
Section 14.5 ................................................................................................................. 17

**ARTICLE FIFTEEN - NON-DISCRIMINATION** .......................................................... **18**
Section 15.1 ................................................................................................................. 18
Section 15.2 ................................................................................................................. 18

**ARTICLE SIXTEEN - NO STRIKE - NO LOCKOUT** ................................................................. **18**
    Section 16.1 .................................................................................................................. 18
    Section 16.2 .................................................................................................................. 18
    Section 16.3 .................................................................................................................. 19
    Section 16.4 .................................................................................................................. 19

**ARTICLE SEVENTEEN - MANAGEMENT RIGHTS** ............................................................ **19**

**ARTICLE EIGHTEEN - RETIREMENT** ................................................................................ **19**
    Section 18.1 .................................................................................................................. 19

**ARTICLE NINTEEN - MISCELLANEOUS** ......................................................................... **20**
    Section 19.1 .................................................................................................................. 20
    Section 19.2 - Bulletin Board ....................................................................................... 20
    Section 19.3 - Labor-Management Meetings .............................................................. 20

**ARTICLE TWENTY - EXISTING PRACTICES WAIVER, ENTIRE AGREEMENT AND
SEVERABILITY** ................................................................................................................ **21**
    Section 20.1 - Waiver ................................................................................................... 21
    Section 20.2 - Amendments ......................................................................................... 21
    Section 20.3 .................................................................................................................. 21
    Section 20.4 .................................................................................................................. 21

**ARTICLE TWENTY-ONE - JUST CAUSE TO DISCIPLINE** ................................................ **22**
    Section 21.1 .................................................................................................................. 22
    Section 21.2 .................................................................................................................. 22

**ARTICLE TWENTY-TWO - TERM OF AGREEMENT** ....................................................... **22**
    Section 22.1 .................................................................................................................. 22
    Section 22.2 .................................................................................................................. 22

**ARTICLE TWENTY-THREE - DIVERSION OF WORK** ...................................................... **22**
    Section 23.1 .................................................................................................................. 22

**ARTICLE TWENTY-FOUR - SUCCESSORS AND ASSIGNS** ............................................. **23**
    Section 1 ....................................................................................................................... 23
    Section 2 ....................................................................................................................... 23

**SEVERANCE PROVISION** ............................................................................................... **23**

**Appendix A - Wages** ...................................................................................................... **24**

**Appendix B - HFS Employee Seniority** ........................................................................ **26**

THIS AGREEMENT is made and entered into this 1st day of June, 2019 by and between DPI Dedicated Logistics, Hodgkins, IL; Indianapolis, IN; Fenton, MO; and Roseville, MN (the Employer) and DELIVERY DRIVERS, SPOTTERS, WAREHOUSE, AND MISCELLANEOUS EMPLOYEES, LOCAL UNION NO. 710, AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, (the Union).

## INTENT AND PURPOSE

The purpose of the Employer and the Union in entering into this Agreement is to set forth their agreements on rates of pay, hours of work, and other conditions of employment so as to promote orderly and peaceful relations with the employees, to achieve uninterrupted operations, and to achieve the highest level of employee performance and customer service consistent with safety, good health and sustained effort.

## ARTICLE ONE
## RECOGNITION

**Section 1.1**

The Employer hereby recognizes the Union as the sole and exclusive collective bargaining representative for all full-time warehousemen, drivers, driver helpers, and sanitation employees employed by the Employer at the following addresses, but excluding all other employees, including office clericals, guards and supervisors as defined in the Act.

6800 Santa Fe Dr, Suite E, Hodgkins, IL, 60525
4001 W Minnesota St., Indianapolis, IN 46241
589 Axminister Dr., Fenton, MO 63026
2580 Long Lake Rd., Roseville, MN 55113

## ARTICLE TWO
## UNION SECURITY

**Section 2.1 - Union Shop**

All present employees who are members of the local Union on the date of the execution of this Agreement shall remain members of the Local Union in good standing as a condition of employment. All present employees who are not member of the Local Union as a condition of employment on and after the thirty-first (31st) day following the beginning of their employment or on and after the thirty-first (31st) day following the effective date of this Section of the date of this Agreement, whichever is later.

For purposes of this Article, the obligation of any employee to become a member of the Union "in good standing" shall be met upon the payment, or tender of payment, of the initiation fee and dues uniformly required by the Union as a condition for membership.

1

**Section 2.2**

(a)     Membership as used herein shall mean only the obligation to pay periodic dues and initiation fees uniformly required, or, in the event that he employee objects to the payment of full dues and initiation fees, only the obligation to pay period dues and initiation fees related to representational costs "financial core" membership.

(b)     Actual membership in the Union is not compulsory. Employees have the right to join, not join, maintain or drop their membership in the Union as they see fit. Neither party shall exert any pressure on or discriminate against any employee to encourage or discourage Union membership except for "fair share" membership.

(c)     Actual membership in the Union is separate, apart and distinct from the assumption by one of his equal obligation to the extent that he receives equal benefits. The Union is required under this Agreement to represent all of the employees in the bargaining unit fairly and equally without regard to whether or not an employee is a member of the Union. The terms of this Agreement have been made for all employees in the bargaining unit and not only for members of the Union. Accordingly, it is fair that each employee in the bargaining unit pays his own way and assumes his fair share of the obligation along with the grant of equal benefit contained in this Agreement, subject to the limitations contained in Section 2.1, above.

**Section 2.3**

Upon receipt of a written check-off authorization form an employee, the Employer agrees to deduct each month during the term of this Agreement, the applicable initiation fees and monthly dues and assessments uniformly required for obtaining and maintaining membership in the Union from the pay of each employee covered by this Agreement and shall remit the same to the Union, no later than the end of the month following the month in which the deduction is made, together with an itemized statement of such deductions. The Union shall certify to the Employer in writing each month a list of its members working for the Employer who have furnished to the Employer the required authorization, together with an itemized statement of dues, initiation fees, (full or installment), and the Employer shall deduct such amount from the first paycheck following receipt of statement of certification of the member and remit to the Union in one lump sum. The Employer shall add to the list submitted by the Union, the names of all regular new employees hired since the last list was submitted and delete the names of employees who are no longer employed. Where an employee who is on check off is not on the payroll during the week the deduction is to be made or who has no earnings or insufficient earnings during that week or is on leave of absence, the employee must make arrangements with the Union to pay such dues.

No deductions shall be made which are prohibited by applicable law, and no obligations under this Article Two shall exist unless and until the Union has complied with all legal obligations regarding employee options concerning union membership and the payment of dues or fees.

**Section 2.4**

No provisions of this Article shall apply to the extent that it may be prohibited by state law.

**Section 2.5**

The Union shall indemnify, defend and hold the Employer harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by reason of action taken or not taken by the Employer, for the purpose of complying with any of the provisions of this Article.

**Section 2.6**

A new employee shall be on probation for a period of ninety (90) calendar days within the bargaining unit. During such period a probationary employee shall have no seniority and no contractual rights under any provision of this Agreement. The probationary period may be extended by the Employer with agreement by the Union, which agreement shall not be unreasonably withheld. Upon successful completion of the probationary period, the seniority of such employee shall be computed as of the date of hire with the Employer.

**Section 2.7 - DRIVE**

The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE. DRIVE shall notify the Employer of the accounts designated by each contributing employee that are to be deducted from his/her paycheck on a weekly basis for all weeks worked. The phrase "weeks worked" excludes any week other than a week in which in the employee earned a wage. The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one check the total amount deducted along with the name of each employee on whose behalf the deduction is made, the employee's social security number and amount deducted from that employee's paycheck, The International Brotherhood of Teamsters shall reimburse the Employer annually for the Employer's actual cost for the expenses incurred in administering the weekly payroll deduction plan for DRIVE.

## ARTICLE THREE
## BARGAINING UNIT WORK

**Section 3.1**

Bargaining unit work shall be performed by bargaining unit employees.

**Section 3.2**

Nothing in this Agreement shall prohibit or interfere with the right of the Employer to hire temporary employees who shall be covered by this Agreement. The Employer may utilize temporary employees for vacation coverage only on a one-for-one basis. The Employer shall provide upon request of the Union the names, dates and hours of all temporary vacation coverage employees utilized.

Once temporary employees are utilized in a particular job for one hundred twenty (120) days, that work shall immediately become bargaining unit work and bargaining unit members. Any route in existence that has been done thirty (30) times in ninety (90) days shall become a new remote route for bargaining unit members.

# ARTICLE FOUR
# MINIMUM RATE OF PAY

**Section 4.1**

Job classifications, the minimum rates of pay and schedules applicable thereto and the effective dates of said rates are set forth in Appendix A attached hereto.

**Section 4.2**

If, during the term of this Agreement, new job classifications are established within the bargaining unit or the duties of an existing job classification are combined or substantially changed, the Employer will put the new or changed job classification into effect and establish a rate of pay therefore. Such rate will be negotiated with the Union in advance with the object of obtaining its Agreement thereon.

**Section 4.3**

The rates of pay set forth in Appendix A are minimum rates. Nothing herein shall preclude the Employer from paying or continuing to pay any employee a rate in excess of the rate set forth in Appendix A, but the Employer shall have no obligation to do so.

The Employer may at its discretion establish, modify, or discontinue any incentive or bonus plan or practice, after the Employer has discussed such changes with the Union.

**Section 4.4**

Time and one-half the employee's regular straight-time rate of pay shall be paid for all hours worked in excess of 40 hours in a payroll week.

**Section 4.5**

The parties agree that the top 80% of the current Seniority Roster shall be guaranteed 40 hours of work or its equivalent in pay, when reporting for work. The remaining 20% of the current Seniority Roster shall not be guaranteed 40 hours and may be subject to call when needed on a daily basis. All Employees shall be guaranteed not less than 8 hours continuous work or its equivalent in pay (if on a 5 day schedule) or 10 hours or its equivalent in pay (if on a 4 day schedule) when called in or put to work with the exception of the 5th or 6th day, when a minimum daily guarantee of 4 continuous hours shall prevail at time and one-half the hourly rate. In the event of an "Act of God," the Employee shall not be guaranteed 40 hours for that week. The Employer, with a Union Member present, will

4

notify the Employee's to not report to work. In the event there is limited work, available work will be offered in seniority order by classification.

**Section 4.6 - Jury Duty**

A non-probationary employee called to serve on a state or federal grand or petit jury shall receive, as a maximum for all such service during the term of this Agreement, the difference between the amount the employee would have earned (up to a maximum of eight (8) hours or ten (10) hours of straight-time pay per day, as determined by their schedule) and the jury pay for a maximum of ten (10) days' service during the terms of this Agreement. Employees must show the jury summons to their supervisor as soon as possible and must provide verification of any amount of jury pay received to be eligible for paid jury pay.

**Section 4.7 - Funeral Leave**

in the event of a death in the regular full-time non probationary employee's immediate family, the employee shall be provided up to three (3) days off (ending with the day of the funeral) with pay at the employee's regular rate of pay, up to a maximum of eight (8) hours or ten (10) hours of straight time pay per day, as based on their current schedule during the employee's standard work week, to prepare for and attend the funeral. If an employee must travel 100 miles or more one way to attend the funeral, the employee will be provided up to an additional two (2) days off without pay.

Immediate family, for the purpose of this Section, shall be defined as parent, sibling, spouse, domestic partner, and child/stepchild. An employee is entitled to up to two days off (one day paid, one day unpaid) to attend the funeral of the employee's in-law, grandparent, or grandchild.

To qualify for pay or time off under this provision, the employee must submit the request per the Employer policy. When the funeral is outside of the United States, the employee need not attend the funeral but must, if requested; provide satisfactory proof of death and relationship. Employees who falsely attempt to claim pay under this provision will be subject to immediate discharge.

## ARTICLE FIVE
## HOURS OF WORK, BREAKS AND OVERTIME

**Section 5.1**

The provisions of this Article are intended to provide the basis for calculating overtime pay and shall not be construed as a guarantee of, or limitation on, hours of work per day or days of work per week.

**Section 5.2**

For payroll purposes, the normal workweek shall commence on 12:01 a.m. Sunday and shall end at 12:00 midnight the following Saturday. Payday shall be on the Friday following the end of the bi-weekly payroll week for all hours worked in the previous payroll period. Time clocks shall be installed and kept in working order. Employees shall accurately record all time worked. Any

employee who improperly records time or alters his or her timecard, and any employee who punches in or out for any other employee or who permits another employee to punch them in or out for them shall be subject to immediate discharge.

**Section 5.3**

The Employer may adjust or change starting times and work schedules, including breaks, to accommodate the business circumstances. All employees will be provided with notice of work schedules and a 48-hour notice for any change in work schedules. Any change in an Employee's schedule without a forty-eight (48) hour notice will result in penalty pay of one and a half times (1 ½ x) the Employee's hourly rate of pay for the day it was changed.

**Section 5.4**

Overtime shall be awarded by seniority and qualification for Warehouse Employees and Drivers. If additional people are needed, the Employer will select the employee from a list of volunteers, which shall be posted by the time clock. Once all volunteers have signed and additional employees are needed, the Employer may force in reverse by seniority order. This process must be completed two (2) hours before shift end for Warehouse employees.

**Section 5.5**

The meal period shall consist of thirty (30) unpaid minutes. Driver's breaks shall be taken in compliance with DOT regulations

**Section 5.6**

Warehouse Employees and Drivers shall receive one 20 minute break between the first and fourth hours of work and one 10 minute break between the fifth and eighth hour of work. The Employer shall determine when each Employee shall be entitled to their break.

## ARTICLE SIX
## HOLIDAYS

**Section 6.1**

The following days shall be recognized as holidays under this Agreement for all full- time employees who have completed their probationary period, for the purpose of pay only.

| New Year's Day | Labor Day |
|---|---|
| Memorial Day | Thanksgiving Day |
| Fourth of July | Christmas Day |
| Employee's Birthday | |

**Employees must give seven (7) days advance notice to schedule their Birthday Holiday.** If the employee's birthday falls on a regular non-scheduled workday, he will be entitled to the scheduled day before or after such day.

## Section 6.2

To be eligible for holiday pay, an employee must satisfy all of the following requirements:

The Employee must have worked all of the scheduled workday before and all of the scheduled workday following the holiday;

## Section 6.3

Holiday pay will be calculated based on the Employee's current work schedule up to a maximum of eight (8) hours or ten (10) hours.

## Section 6.4

Any employee scheduled to work on a holiday shall receive one and two (2) times their regular straight time hourly rate for all hours worked, **in** addition to holiday pay.

## Section 6.5

Holiday pay shall not be regarded as hours worked for purposes of computing overtime pay.

## Section 6.6

In the event a holiday falls during a week in which an employee is on vacation such employee shall receive eight (8) hours or ten (10) hours, based on their work schedule.

## Section 6.7

Any Employee who works one of the six (6) recognized Holiday's per Section 6.1 will be paid overtime for hours worked over 30, if on a 4/10 schedule or 32, if on a 5/8 schedule.

Employees who do not work on the designated Holiday will be paid as normal.

## ARTICLE SEVEN
## VACATIONS

**Section 7.1**

Eligible employees shall receive the following vacation time and vacation pay:

**CONTINUOUS SERVICE**

| | |
|---|---|
| 1 year | 2 weeks |
| 5 years | 3 weeks |
| 10 years | 4 weeks |
| 15 years | 5 weeks |

New employee's vacations are earned as of the anniversary date of hire and must be taken no later than December 31 of the following year. Existing Employees, employees of the Employer for 1 year or more, vacation time will reset January 1 of each calendar year to be used by December 31 of that year. Employees must take not less than two weeks of vacation time each year. Any earned but unused vacation cannot be carried over and will be paid out at forty (40) hours of straight time pay on December 31 of the year in which it is to be used, with the exception of new Employees hired after October 1, who will be allowed an additional year to take their first year vacation time.

**Section 7.2**

To be eligible for vacation benefits provided in Section 7.1, above, the employee must have been employed one full year and must have worked at least 1,250 straight time hours in the preceding calendar year. Hours paid for but not worked shall not be counted as hours worked for purposes of vacation eligibility. However, if an employee fails to work 1,250 hours due to the employee's illness or work-related injury, the employee shall receive a fraction of his or her vacation equal to the number of hours actually worked divided by 2000.

**Section 7.3**

Employees may split one (1) week of vacation into daily increments. The total number of vacation weeks divided by the total number of allowed vacation weeks will be used to calculate the weekly maximum number of drivers, driver helpers, sanitation or warehouse employee that will be granted vacation time. Additional employees will be considered at the discretion of the Employer as business conditions dictate. Vacations will be bid by seniority from November 1st to December 1st. Any employee choosing not to bid during this period will need to give 7 days' advanced notice for time requested and will be granted if another employee had not already been granted the week. Vacations shall be awarded on the basis of seniority at vacation bid time. After the vacation bid is complete, vacations shall be awarded on a first come, first served basis.

**Section 7.4**

For purposes of calculating vacation time, Employer will grandfather in HFS employees seniority date, for such employees hired within 30 days of the original agreement as listed in Appendix B.

**Section 7.5**

Employees may sell back one (1) week of vacation to the Company at a rate of forty (40) hours straight time and work that week. If an employee chooses to sell back one (1) week of vacation after he/she has bid that week, he/she must give notice at least two (2) weeks prior to the start of the bidded week

**Section 7.6**

Employees will submit their vacation bid for the following year by November 1. The Company will post the completed vacation schedule for all employees to see by December 1. Any vacation weeks cancelled after the bid is complete must be posted within twenty-four (24) hours of the cancellation.

A minimum of six percent (6%) of the workforce in each classification by location shall be allowed off on vacation on a given day.

# ARTICLE EIGHT
# PERSONAL AND SICK DAYS

**Section 8.1**

Each employee will receive three (3) Personal Days and four (4) Sick Days each calendar year. Personal days are to be scheduled at least seven (7) days in advance. Notice of the approval or denial will be given within twenty-four (24) hours to the employee. Four (4) Employees per day will be granted Personal time off. If an employee is approved for a Personal day, the Employer will bypass this Employee's seniority to avoid work on their scheduled days off; with the exception of a situation where all Employees have been scheduled and there is still available work. Sick days are to be used by May 31 of each year or paid out on the next pay day at the Employee's regular straight time pay. Personal and Sick days will reset June 1 for existing employees.

Any earned but unused Personal time will be paid out in the first (1st) pay period after June 1, beginning in 2015.

# ARTICLE NINE
# LEAVES OF ABSENCE

**Section 9.1**

A personal leave of absence may be granted with the Employer and Union approval to any seniority employee who has completed at least one (1) year of continuous service at the time the leave begins. The leave of absence must be for good cause. Accepting other employment shall not constitute good cause.

If granted, such leave shall not exceed two weeks in any twelve (12) month period. Not more than one such leave shall be granted in any twelve (12) month period. The request for such leave of absence must be submitted per the Employer policy. The Employer reserves the right to limit the length of such leave and/or the number of employees who may take such leave at any one time. Such leaves, if granted, will be without pay and benefits, but without loss of seniority if the employee returns to work immediately at the expiration of such leave.

**Section 9.2**

An employee who leaves or who may hereafter leave the Employer's service to enter directly into service, with the Armed Forces of the United States shall be eligible for re-employment in accordance with the terms of the applicable federal and state law.

**Section 9.3**

The Employer will conform to any applicable state and federal law concerning the Family and Medical Leave Act, which shall include the right of the Employer to require employees to take any available paid leave or time off as part of such leave.

# ARTICLE TEN
# HEALTH AND WELFARE

**Section 10.1**

The Employer shall during the term of this Agreement make available DPI Health and Welfare Benefit Plan to all regular full-time employees. Such employees shall be eligible for coverage on the first day of the calendar month following two (2) full calendar months of active employment. That plan may from time to time be amended in accordance with the Plan, which is hereby incorporated into this Agreement by reference as if fully set forth herein. A copy of any changes will be sent to the Union. Employees will enroll for the Benefit Plan per the Employer policy.

**Section 10.2**

The Employer shall continue to pay its portion of the cost of coverage for those employees not actively employed for any reason (except termination for case or resignation) through the end of the month in which active employment ceased. Any employee desiring to continue such coverage thereafter may do so, at the employee's expense, in accordance with the provision of "COBRA".

**Section 10.3**

Nothing in this Agreement shall preclude the Employer from changing insurance carriers or administrators or self-insuring all or any part of such coverage.

**Section 10.4**

The parties agree that, to the extent that the Employer's obligations under this Article are discharged by means of insurance policies obtained by it and to the extent such obligations are discharged by a plan of benefits established by it, such obligations are limited solely in the one case to the payment of the insurance premiums provided for in the insurance policies and in the other to the payment of the benefits provided in said plan, and employees and their dependents and beneficiaries shall be entitled to benefits only in accordance with and governed by the terms and conditions of the insurance policies issued to provide such benefits or by the terms and conditions set forth in said plan, respectively. Neither the Employer nor the Union shall themselves be obligated to pay for any insurance benefits directly to employees or their dependents or beneficiaries or to pay them any benefits other than those provided in said plan. Any dispute over unpaid benefits shall be resolved solely in accordance with the dispute resolution mechanism contained in the plan and not in accordance with Article Eleven of this Agreement.

# ARTICLE ELEVEN
# RESOLUTION OF GRIEVANCES

### Section 11.1 - Discipline and Discharge

All differences, disputes, and grievances that may arise between the employees, the Union, and the Employer during the term of this Agreement involving interpretation or application of this Agreement, including the question whether an employee has been disciplined or discharged for just cause, shall be taken up in the manner set forth below. If any employee or group of employees feel that any rule, policy, instruction, or order of a supervisor is improper, that employee or group of employees shall comply with the rule, policy, instruction, or order, but may thereafter file a grievance under the grievance procedure provided in this Agreement.

All suspension and discharge notices shall be sent to the Employee by certified mail to their last known address. All letters of warning, suspension, and discharge shall be forwarded to the Union promptly. Union Stewards shall be provided copies of all discipline on site.

### Section 11.2

Grievances must be filed and processed in the following manner:

**STEP 1:** Between the aggrieved employee and/or the Steward and the employee's immediate supervisor. The dispute at this step will be oral. If no satisfactory settlement is reached at Step 1, the matter maybe reduced to writing and referred to Step 2. To be timely, a grievance must be raised within ten (10) calendar days after the occurrence of the event giving rise to the grievance.

**STEP 2:** Within seven (7) calendar days of the Employer's answer in Step 1, the matter may be reduced to writing, signed by the employee or employees involved and the Union Steward, and presented to the Operations Manager. The dispute will be discussed between the Steward and/or Union Representative, the Operations Manager (or their designee) and the employee involved. Such discussion shall be held promptly, and the Employer will promptly provide its answer. Grievances

involving discharges or suspensions must be initiated by the Union or the employee at Step 2 and must be filed within ten (10) calendar days of the date of discharge or suspension. If settlement is reached, it shall be final and binding on all parties.

**STEP 3:** Within seven (7) calendar days of the employer's answer in Step 2, the matter maybe referred by the Union to a Joint Grievance Committee, composed of four (4) members, two (2) selected by the Employer and two (2) selected by the Union. The committee shall meet promptly to attempt to resolve the grievance. The Committee shall have the power to require documentation, from either party, necessary to complete disposition of the grievance including, but not limited to, applicable payroll records and time sheets. Upon settlement of the grievance, the Union will provide the Employer a written copy of the final disposition of the grievance. A deadlock by the Committee gives both parties the right to arbitrate.

**STEP 4:** If the grievance is elected to be Arbitrated, then the Union may refer the matter in writing to Arbitration in accordance with the procedures set forth in Section 11.3. The parties shall formulate Rules of Committee to govern the proceedings prior to the first grievance.

### Section 11.3 - Cumulative Remedy

If the Employer or Union fails to comply with an arbitration award of a final decision of the Joint Grievance Committee, no earlier than 60 days after the date of such award or decision, either party shall have the right to exercise all legal and economic recourse, final and binding ruling of the Arbitrator, as both as described in this Article, or in cases involving pay claims, the Joint Grievance Committee shall have the authority to award, full, partial or no back pay. Decisions rendered by the Joint Committee shall be final and binding upon all parties.

### Section 11.4 - Arbitration

If any grievance is not resolved in the manner set forth above, then any such grievance timely processed through the above procedure may be appealed to arbitration by the Union by giving written notice of its desire to arbitrate. Such notice must be presented to the Employer Human Resource designee within ten (10) calendar days of the date of the Employer's answer in Step 3.

The Union shall, within ten (10) calendar days of giving such notice to the Employer, request the Federal Mediation and Conciliation Service to submit a panel of five (5) arbitrators, all of whom are members of the National Academy of Arbitrators. The parties shall select the Arbitrator from that list by alternately striking the names until one name remains. Either party shall have the right to reject the first panel.

Separate grievances may not be joined in a single arbitration except by mutual agreement of the parties.

The Arbitrator shall be bound by the express provisions of this Agreement and shall not have the power to add to or subtract from or modify any of the express provisions of this Agreement, not create any obligation not expressly intended by the provisions of this Agreement, nor find that any time limited has been waived absent specific written agreement of the parties to such waiver. The

Arbitrator's decision consistent with this authority shall be final and binding on the Employer, the Union, and the employees.

The cost of arbitration will be paid by the loser. Such costs shall include the filing fee, if any, Arbitrator's fee and expenses, transcript, and place of holding the hearing. Each party shall be responsible for compensating its own representative and witnesses.

In the event any back pay award is determined to be appropriate, any interim earnings or unemployment compensation received by the employee shall be deducted from the amount due. Pending final disposition by the Arbitrator, the employee discharged shall use all available means to mitigate the potential back pay liability, and the Employer shall have the right to request verification thereof. The time limits set forth in this Article are "of the essence" and cannot be waived or extended except by written agreement of both parties. Any grievance not appealed to the next step in a timely manner within the time limits set forth above shall be considered withdrawn and not subject to further appeal.

**Section 11.5 - Corrective Action Steps**

Corrective Action steps will apply as follows, except for just cause:

  (1)  Documented Verbal Warning
  (2)  Written Warning
  (3)  Final Warning
  (4)  Termination

"Just cause" is defined as theft, being under the influence alcohol of illegal substances while on the job or violence in the workplace, when such charges are proven. Refusal to take an alcohol or drug test shall establish a presumption of guilt.

The Employer has the right, but is not required to suspend an Employee without pay pending investigation. The Employer will complete the investigation within ten (10) days.

# ARTICLE TWELVE
# UNION REPRESENTATION

**Section 12.1**

The Employer recognizes the right of the Union to select or elect from its employees who are members of the Union job stewards to handle in accordance with this Agreement such union business at the Employer's premises where they are employed, as may from time-to-time be delegated to than by the Union, in connection with the Collective Bargaining Agreement. The name of such job stewards shall be furnished in writing to the Employer and any change in stewards shall be reported to the Employer in writing. All union business shall be conducted promptly.

No grievance processing or any other union business shall be conducted at any time or in any manner which interferes in any way with customer service, or which interferes with the work of the

Steward or the work of any of the Employer's employees. A Steward engaging in duties under this Agreement must first obtain permission from his/her immediate supervisor, and the supervisor of any other employee involved. Permission shall not be unreasonably withheld. When necessary, an employee may meet with his or her steward solely for the purpose of filing a grievance in accordance with the provisions of Article Eleven; provided such employee has first notified and obtained permission from his or her immediate supervisor and the Steward's immediate supervisor. Permission shall not be unreasonably withheld. Such meetings will be kept to a minimum and must be conducted in a manner that does not interfere with production, the work of the employee, or the work of the Steward. Grievance meetings held pursuant to Article Eleven of this Agreement shall be scheduled by the Employer, either during working or non-working time, so as to minimize disruption or interference with work. Time spent by employees including Union Stewards, in such grievance meetings with the Employer (if during the employee's regular working time) shall not be paid for by the Employer, but shall be counted as time worked for purposes of overtime, provided such employee or steward has otherwise worked all of their scheduled hours during the week.

**Section 12.2**

The authority of job stewards so designated by the Union shall be limited to, and shall not exceed, the following duties and activities:

(a) The investigation and presentation of grievances.

(b) The collection of dues when authorized by appropriate local Union action

(c) The transmission of such messages and information which shall originate with and are authorized by the local Union or its officers, provided such messages and information:

(1) Have been reduced to writing, or

(2) If not reduced to writing are of a routine nature and do not involve work stoppages, slow-downs, refusals to handle goods, or any other interference with the Employer's business or customer service.

**Section 12.3**

Job stewards and alternates have no authority to take strike action, or any other action interrupting the Employer's business. The Employer shall have the authority to impose discipline, including discharge, in the event the steward or any other employee has taken unauthorized strike action, slowdown or work stoppages in violation of this Agreement.

**Section 12.4**

A representative of the Union shall be granted access to visit the facility to talk with Employer representatives or Union members.

**Section 12.5 - Extra Contract Agreements**

The Employer agrees not to enter into any agreement or contract with its employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void.

# ARTICLE THIRTEEN
# SENIORITY

**Section 13.1**

Seniority shall prevail in all instances and circumstances. An employee's seniority is his or her length of continuous service with the Employer from the most recent date of hire as reflected in records of the Employer. The Employer shall furnish to the Union a current seniority list each three (3) months. Such list shall be deemed accurate and the Employer shall not be liable for any errors in the list until the error is brought to the Employer's attention in writing. The Employer will honor the seniority of the HFS employees listed in Appendix B until such date the designated employee is terminated. If an employee listed in Appendix B is re-employed by the Employer, seniority will reset to the new date of hire.

**Section 13.2**

An employee's seniority and employment shall terminate for any of the following reasons:

(a)     If the employee quits, retires or is discharged for cause;

(b)     If the employee is absent from work due to layoff in excess of twelve (12) months, or fails to report for work within seven (7) calendar days of notice of recall by telephone or telegram or within seven (7) calendar days from the date of first attempt at delivery of a certified notice of recall (but in no event later than 10 calendar days of mailing);

(c)     If the employee is absent without notification to the Employer for three (3) consecutive working days;

(d)     If the employee fails to return to work or notify the Employer within the period of time granted by the Employer's authorized leave of absence or a scheduled vacation.

(e)     If the employee gives a false reasons for leave of absence or accepts other employment during such leave;

(f)     If the employee makes a false statement or representation on the Employee's employment application, or fails to state a fact or condition, provided such falsification or omission is of such a nature as to have precluded the employee's hiring if disclosed;

(g)     If the employee secures or attempts to secure any benefit provided for in this Agreement or by law through falsification or deceit;

**Section 13.3**

Job classification seniority shall be determined by the date an employee is permanently assigned to a job classification. For purposes of this Agreement there shall be the following job classifications: (1) General Warehouse, (2) Class A Drivers, and (3) Class B Drivers, (4) Driver Helpers, (5) Sanitation.

**Section 13.4**

In cases of a layoff within a job classification for a period of time more than five (5) consecutive workdays and recalls for a period of more than five (5) consecutive workdays, employees shall be laid off in reverse seniority order and recalled in order of seniority.

**Section 13.5**

When a permanent vacancy occurs, the Employer will inform Employees and give Employees an opportunity to bid for the vacancy. The bid will be posted for seven (7) days and awarded based on seniority and qualification

**Section 13.6**

Any employee in a non-driving position who has been transferred, assigned or recalled by the Employer to a job within the bargaining unit shall be given thirty (30) calendar days to demonstrate the employee's ability and fitness to perform the duties of such job classification. If the employee is unable to perform the job to the Employer's satisfaction during that period or the employee decides he/she does not want the new job, the employee shall return to the employee's former position and pay.

Drivers changing to another driver classification within the bargaining unit shall be given thirty (30) calendar days to demonstrate the employee's ability and fitness to perform the duties of such job classification. If the employee is unable to perform the job to the Employer's satisfaction during that period or the employee decides he/she does not want the new job, the employee will be returned to the employee's former position and pay.

**Section 13.7**

An employee who is or has been promoted or transferred out of the bargaining unit shall not be transferred back into the bargaining unit.

# ARTICLE FOURTEEN
# HEALTH AND SAFETY

**Section 14.1**

The Employer and the Employees shall make every effort to see to it that the work performed under the terms and conditions of this Agreement are performed with a maximum degree of safety consistent with the requirements to conduct efficient operations. The Employer shall establish and post reasonable safety rules in a conspicuous place.

**Section 14.2 - Protective Clothing**

Safety-related clothing (except safety shoes) which the Employer requires employees to wear shall be furnished and maintained by the Employer. Any employee furnished with such equipment shall be required to wear it and shall safeguard the equipment against theft and misuse. Such equipment shall not be used away from work. Loss of such equipment may be subject to progressive discipline.

The Employer requires employees to wear safety boots or shoes that meet the minimum requirements per the Employer Safety Policy, The Employer shall reimburse the employee provided the following; the employee has been employed one year or more; the cost of such boots or shoes does not exceed $200.00 per year; and the Employee has presented an original receipt.

The Employer will provide a designated area for Warehouse freezer selectors to have access to a heater.

**Section 14.3**

Any employee injured on the job will be paid for that entire shift scheduled. The Employer also agrees to the prompt disposition of Workers' Compensation claims.

**Section 14.4**

The Employer may require a Fitness for Duty medical evaluation.

**Section 14.5**

The Employer will administer discipline for Safety Related offenses based on the peer review process. Such offenses will be so noted as safety related at the time of discipline. It is understood that it is the practice of the Employer to discharge any Employee who has a runaway accident, three (3) proven avoidable accidents within a twelve (12) month period, or who fails to report an accident. The decision of the peer review committee shall not be used as evidence in a grievance hearing. All supporting evidence presented to the peer review committee may be allowed in the grievance hearing.

The peer review committee shall be made up of two (2) company representatives and two (2) union employees within classification as chosen by the union. In the event of a tie, a third union employee as chosen by the union will make the decision.

## ARTICLE FIFTEEN
## NON-DISCRIMINATION

**Section 15.1**

The Employer and the Union agree not to discriminate against any employee with respect to any term and condition of employment on account of race, color, gender, sexual orientation, marital status, veteran status, arrest record, national origin, age, religion, disability unrelated to ability to perform work, or union membership in violation of any federal, state, or local statute.

**Section 15.2**

The Employer will comply with Family Leave, Americans with Disabilities Act and all State and Federal Laws.

## ARTICLE SIXTEEN
## NO STRIKE - NO LOCKOUT

**Section 16.1**

During the term of this Agreement neither the Union nor its officers, agents, or representatives shall authorize, instigate, condone, sponsor, participate in, support, promote or encourage in any way, nor will any employee engage in or encourage, any strike (including unfair labor practice or sympathy strikes), picketing, boycott, work stoppage, or slowdown, and during the term of this Agreement the Employer will not lock out any employees because of labor dispute with the Union. Reductions in operation are not to be considered a lockout under the Agreement. It shall be the affirmative duty of the Union, its officers, agents and representatives to use all reasonable means immediately to encourage employees to cease engaging in any of the conduct prohibited by this Article. The parties recognize the right of the Employer to take such discipline, including discharge, against any employee or employees who participate in violation of this Article, whether such action is taken against all of the participants or against only certain participants.

**Section 16.2**

It is understood and agreed that the Union shall have no financial liability under this Article for the unauthorized acts of its members, provided the Union promptly and in good faith uses all reasonable means to bring an end to such activity in violation of this Article.

The Union has the right to take all economic or legal actions if the employer doesn't comply with a grievance or arbitration decision.

**Section 16.3**

> In the event there is a strike, stoppage of work, slowdown, or other activity prohibited by this Article during the term of this Agreement, neither party shall be obligated to negotiate the merits of the dispute which cause such interruption until such time as the activity is terminated.

**Section 16.4**

> Violation of any provision of this Article shall be cause for the Employer's entitlement to any relief which may be available at law or in equity, including injunctive relief, regardless of the cause of the violation.

## ARTICLE SEVENTEEN
## MANAGEMENT RIGHTS

Except as otherwise specifically provided in this Agreement or restricted thereby, all of the rights, prerogatives and authority that the Company had prior to the execution of this Agreement are retained by the Company and remain exclusively with the Company. Specifically, but not by way of limitation, the Union recognizes the right of the Company to hire and direct all employees; to determine the necessity for filling a vacancy; to discipline, suspend or discharge employees for just cause; to assign, supervise and direct the work force; to maintain discipline within the work force; to promulgate and enforce reasonable plant rules; to lay off employees because of lack of work; to schedule the house of the work force; to determine the length of the work week; to determine the types of products and the extend of services that are to be performed at the Company's facilities; to regulate the use and control of all Company equipment and property; to change or modify its operations; to determine the extent to which its facilities shall be used; to continue or discontinue all or any part of its business; to alter or modify the nature of its business or its method of doing business; to establish incentive programs upon consultation with the Union's approval; and generally to control and supervise its operations and to exercise the customary functions of management in carrying out its business.

## ARTICLE EIGHTEEN
## RETIREMENT

**Section 18.1**

> Effective May 25, 2010, or as soon thereafter as is feasible, all regular, full-time bargaining unit employees who qualify for such coverage will be automatically enrolled into the Employer 401(k) Plan. That plan may from time to time be amended in accordance with the Plan, which is hereby incorporated into this Agreement by reference as if fully set forth herein. The rights of the employees to the benefits of such Plan shall be as defined and limited by the provisions of such Plan and of any trust agreement(s) entered into in accordance with the provisions of such Plan and the

rules and regulations applicable thereto as may be duly and lawfully established in accordance therewith.

# ARTICLE NINTEEN
## MISCELLANEOUS

**Section 19.1**

The Employer will not enter into any contract with any employee or employees which in any way conflicts with the express provisions of this Agreement.

**Section 19.2 - Bulletin Board**

The Employer agrees to provide suitable space for a Union Bulletin Board. Postings by the Union on such boards are to be confined to Official Business of the Union signed by an authorized non-employee representative of the Union. Postings shall not be of a political nature and shall not contain material critical of the Employer. A copy of any posting shall be provided to the Employer prior to posting.

**Section 19.3 - Labor-Management Meetings**

The Union and Employer may establish a Labor- Management Committee composed of management and labor representatives. The purposes of the Committee are to identify problems causing loss of business and jobs, and to direct communication so as to educate covered employees relative to long term job security through the Employer and Local Union signatory to this Agreement. Such Committee may investigate and make recommendations concerning the way in which work standards and productivity may be improved and shall make every reasonable effort to meet at least twice each year, or more frequently as agreed.

   (a)   The purpose of this statement of principle is to protect the long-range interests of the covered employees, the Employer and the Union

   (b)   During or following such meetings, the Union may make recommendations to the Employer regarding any subject discussed at the meetings. However, such recommendations are advisory only.

   (c)   No agreement, understanding or recommendation resulting from such meetings shall in anyway dilute, diminish, modify or amend any of the rights or obligations existing under this Agreement unless the Employer and the Union enter into a formal, written letter of agreement expressly evidencing their mutual intent to modify this Agreement

## ARTICLE TWENTY
## EXISTING PRACTICES WAIVER, ENTIRE AGREEMENT AND SEVERABILITY

**Section 20.1 - Waiver**

The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understanding and agreements arrived at by the parties after and exercise of that right and opportunity are set forth in the Agreement.

Therefore, the Employer and the Union, for the term of this Agreement, each voluntarily and unqualifiedly, knowingly clearly unmistakably waives the rights, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter referred to or covered in this Agreement, or with respect to any subject matter not referred to or covered in this Agreement even though such subjects or matters may not have been within the knowledge or contemplation for either or both of the parties at the time that they negotiated or signed this Agreement.

**Section 20.2 - Amendments**

Any modification or supplement to this Agreement to be effective must be reduced to writing and executed by proper representatives of each party.

**Section 20.3**

If any Article or Section of this Agreement or if any Riders thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction or if compliance with or enforcement of any Article or Section should be restrained by such tribunal, the parties affected thereby shall enter into immediate collective bargaining negotiations, upon the request of the Union, or the Employer, for the purpose of arriving at a mutually satisfactory replacement for such Article or Section. The remainder of this Agreement not affected by the above shall remain in full force and effect for the duration of this Agreement.

**Section 20.4**

If it agreed and understood by the parties to this Agreement that nothing contained herein shall be in conflict with any existing federal statutes or any valid rules and regulations made pursuant thereto. Whenever a masculine gender appears, it shall include the female gender.

## ARTICLE TWENTY-ONE
## JUST CAUSE TO DISCIPLINE

**Section 21.1**

The Employer will not discipline, suspend or discharge any non-probationary employee without just cause. Before an employee is suspended or discharged, the Employer will provide the employee with a written warning and will provide the Union and the steward a copy of such warning.

**Section 21.2**

Any discipline will be live for eight (8) months

## ARTICLE TWENTY-TWO
## TERM OF AGREEMENT

**Section 22.1**

This Agreement constitutes the entire agreement between the parties and concludes all collective bargaining negotiations for the term hereof. Inasmuch as both parties have had a full opportunity to negotiate with respect to all matters relating to wages, hours, and all other terms and conditions of employment, neither party is under any duty to bargain with respect to any changes, modifications, or additions to this Agreement to take effect during its term.

**Section 22.2**

This Agreement shall become effective as of June 1, 2019, and shall remain in effect until 11:59p.m. May 31, 2022.

## ARTICLE TWENTY-THREE
## DIVERSION OF WORK

**Section 23.1**

The parties agree that for the purposes of this Article, it shall be presumed that a diversion of work due to profitability for the Employer will not result in a violation of this Agreement. This Agreement and work presently and regularly performed by, or hereafter assigned to, Employees of the Employer being performed in the same manner by the Employer will follow within a fifty (50) mile radius of the current facility the work is being performed in.

## ARTICLE TWENTY-FOUR
## SUCCESSORS AND ASSIGNS

**Section 1.**

In the event of a bonafide sale, transfer or assignment, by whatever means or methods, of the Employer's operations, or any part thereof, covered by this Agreement during the term hereof, the Employer shall give advance notice to the new owner, transferee or assignee of the obligations of this Agreement, and shall, as a condition of such sale, transfer, or assignment, require the new owner to hire the Employer's employees, require the new owner to give priority hiring preference to the Employer's employees, to recognize the Union as the employees' exclusive collective bargaining agent, and to negotiate a collective bargaining agreement with the Union in good faith in accordance with the National Labor Relations Act. Any collective bargaining agreement negotiated in accordance with this provision shall, at a minimum, provide that (a) Seniority of employees shall not be broken by such sale, transfer or assignment, and (b) the new employer shall make the severance payments required by the Severance Provision of this Agreement no later than six months after the sale, transfer or assignment. The Employer shall be responsible for any and all monetary benefits that employees have accumulated under this Agreement to the date of sale, transfer or assignment. Seniority of employees shall not be broken by such sale, transfer or assignment.

For the purposes of this Article, priority hiring preference means that the new owner will offer employment to the Employer's bargaining unit employees before employment is offered to any other individual to perform bargaining unit work.

**Section 2.**

The Employer agrees to give the Union no less than fifteen (15) days written notice in the event that it intends to sell, transfer, or assign the operations, or part thereof, covered by this Agreement, and agrees to provide the Union with written documentation establishing the Employer's compliance with Section 1 of this Article no less than ten (10) days prior to such sale, transfer or assignment.

## SEVERANCE PROVISION

A.      In the event the Company lays off employees due to loss of business or sale or transfer of operations to a successor, then each full time employee of DPI from the date of ratification until the date of such layoff, then said employee shall receive a bonus payment equivalent to the higher of three (3) weeks of straight time pay for each year of continuous employment or eight (8) weeks straight time pay, minus any payroll deductions as required by law.

B.      The bonus payment due under Paragraph A above will be paid to the said employee in full at the time of said employee's layoff; provided, however, that if DPI sells or transfers its operations to a successor and said employee is offered employment with the successor, then said successor shall pay a bonus payment of eight (8) weeks straight time pay to said employee six (6) months after the acquisition becomes effective.

## Appendix A
## Wages

The following wage increases shall be effective and retroactive to 6/1/2019:

**General Warehouse**

| Effective 6/1/19 | Effective 6/1/20 | Effective 6/1/22 |
|---|---|---|
| $19.12 | $19.86 | $20.61 |

All hours worked in the freezer will receive an additional fifty cents ($0.50) per hour on top of the employee's hourly rate.

**Sanitation**

| Effective 6/1/19 | Effective 6/1/20 | Effective 6/1/22 |
|---|---|---|
| $15.90 | $16.65 | $17.40 |

**Driver Helpers**

| Effective 6/1/19 | Effective 6/1/20 | Effective 6/1/22 |
|---|---|---|
| $15.90 | $16.65 | $17.40 |

**Drivers - Class A**

| Effective 6/1/19 | Effective 6/1/20 | Effective 6/1/22 |
|---|---|---|
| $25.70 | $26.45 | $27.20 |

**Drivers - Class B**

| Effective 6/1/19 | Effective 6/1/20 | Effective 6/1/22 |
|---|---|---|
| $24.31 | $25.06 | $25.81 |

**Drivers – Non-CDL**

| Effective 6/1/19 | Effective 6/1/20 | Effective 6/1/22 |
|---|---|---|
| $16.84 | $17.59 | $18.34 |

No non-CDL driver can work before a Class A or Class B driver. If a Class A or Class B driver is put to work in a non-CDL position, he/she will be paid their regular rate of pay. No existing routes can be altered to be put on a Non-CDL route.

**New Hires - Driver Class A & Driver Class B**

All Class A and Class B Drivers new hires will start at eighty percent (80%) of the current classification of that classification rate. After six (6) months, he/she shall go to ninety percent (90%) of the current classification rate. After completion of one (1) year, he/she shall go to one hundred percent (100%) of the current classification rate.

Employees who are scheduled to work on a Saturday and/or Sunday shall receive the following additional pay on each Saturday and Sunday worked:

**Warehouse & Sanitation:** Fifty cents ($0.50) per hour
**Drivers & Helpers:** One dollar ($1.00) per hour

Employees who are training a new employee shall receive an additional **two dollars ($2.00)** per hour while training.

In the event the business needs change or there is a reduction in work and the Company changes an employee's classification, the highest rate of pay will remain in effect (For example, if an employee who is in the Driver - Class A classification is required to drop down to the Driver - Class B classification, he/she shall remain at the Driver - Class A rate of pay).

Trip Pay: The Employer has the right to determine routes to be compensated as Trip Pay. Pay for these routes will be negotiated between the parties prior to the implementation of trip pay for such route(s). Routes will be bid in seniority order, by classification. A verifiable breakdown will be compensated on a per hour basis as if the 1st minute of the break down. Once the driver is back in motion, the trip pay will resume. Additional days worked but not scheduled will be paid as one and one half times the trip pay compensated for the route worked.

Trip pay will increase yearly at the same rate as the hourly contracted increase.

**Appendix B**
**HFS Employee Seniority**

| Employee Name | Hire Date |
|---|---|
| Denman, Donald | 12/1/1998 |
| Perez, Ivonne | 12/5/1999 |
| Crosby, Richard | 1/24/2000 |
| Lopez, Monico | 1/2/2001 |
| Perez, Juan | 9/18/2001 |
| Forsyth, Scott | 5/12/2002 |
| Spohr, Steven | 7/1/2002 |
| Williams, LaShawn | 7/2/2002 |
| Williams, Ernest | 8/4/2002 |
| Singh, Pritam | 11/18/2002 |
| Truong, Trung | 6/29/2003 |
| Brown, Damon | 5/26/2004 |
| Wojcik, Marcus | 11/28/2004 |
| Rodriguez, Hipolito | 4/5/2005 |
| Rail, James | 4/5/2006 |
| Young, Steward | 10/8/2006 |
| Dominguez, Eduardo | 5/14/2006 |
| Kazlauskas, Robert | 7/1/2006 |
| Motyka, Donald | 11/4/2006 |
| Mikuta, Keith | 11/20/2006 |
| Estrada, Jesus | 2/15/2007 |
| Herrmann, William | 3/13/2007 |
| Campos, Maria | 5/14/2007 |
| Carrero, Jason | 6/20/2007 |
| Brownlee, Christopher | 6/23/2007 |
| Swierenga, David | 6/23/2007 |
| Sercye, Cordell | 10/18/2007 |
| Kemnetz, Ernest | 1/6/2008 |
| Edmond, Fontaine | 1/7/2008 |
| Humphrey, Cortez | 3/24/2008 |
| Palumbo, Daniel | 3/31/2008 |
| Lewis, Corderro | 4/28/2008 |
| Osiecki, Dennis | 8/25/2008 |
| Purtill, Mike | 7/6/2009 |
| Holland, Robert | 10/28/2009 |
| Johnson, Jeff | 2/9/2010 |
| Kidd, Marvis | 4/5/2010 |

Agreed and entered into this 1st day of June, 2019.

**SIGNED FOR THE UNION**
**Teamsters Local 710**

**SIGNED FOR THE EMPLOYER**
**DPI DEDICATED LOGISTICS, INC.**

_Michael J Caley_
Name

_Benjamin Escobar_
Name

_Michael J Caley_
Signature

_[signature]_
Signature

_Secretary Treasurer_
Title

_SVP Operation_
Title

_10/33/19_
Date

_11/5/2019_
Date

_[signature]_
Business Representative

_11-5-19_
Date Signed

**Letter of Understanding – Teamsters Local 710 and QCD**
**December 31, 2019**

This is to confirm the terms which Quality Custom Distribution (QCD) and
Teamsters Local 710 agree upon.

- QCD agrees to adopt, and become a party to, the current DPI/Teamsters
Local 710 Collective Bargaining Agreement which currently expires on
May 31, 2022, except as specifically set forth below:

- All current DPI employees covered by this CBA will be offered
employment with QCD, subject to QCD hiring requirements being satisfied

- QCD to recognize Teamsters Local 710 as the exclusive collective
bargaining representative for the employees at the former DPI facilities
located in Chicago and Indianapolis.

- The former DPI facilities located in St. Louis and Minneapolis will not be
covered by the current CBA.

- Effective February 2, 2020, DPI transferees will move from the DPI Health
and Welfare Plan to the QCD Health and Welfare Plan, at current QCD
premiums

- Effective February 2, 2020, DPI transferees will move from the DPI 401(k)
Plan to the QCD 401(k) Plan.

- Upon the expiration of the current CBA, the current bargaining unit will be
divided into two separate bargaining units by location, with a separate
CBA, with separate expiration dates, for each location (one for Chicago,
and one for Indianapolis);

- The Company and Teamsters Local 710 agree to negotiate over the
implementation of component pay for drivers in QCD's new Indianapolis
location, and to extend the CBA expiration date as it applies to the
Indianapolis facility by one year, to May 31, 2023, subject to ratification by
the members at that location.

- Displaced drivers servicing St. Louis and Minneapolis may (1) apply for an
open position in either Chicago/Indy, with dovetailed seniority and
reimbursement of moving expenses not to exceed the severance payable
under the current CBA, or (2) receive the severance payable under the
current CBA (drivers who apply for, and do not receive an open position in
either Chicago/Indy remain eligible for severance pay).

- When QCD Chicago West and QCD Chicago East are established, they will be covered by a single CBA, with separate seniority lists at each facility.

Golden State Foods

Ed Rodriguez
Chief Human Resources Officer

12/31/19

Date

Teamsters Local Union No. 710

Michael Cales
Secretary-Treasurer

Date

Quality Custom Distribution

Peter Fisher

12/31/19

Date

Page 2 of 2

**Letter of Understanding – Teamsters Local 710 and QCD**
**December 31, 2019**

This is to confirm the terms which Quality Custom Distribution (QCD) and Teamsters Local 710 agree upon.

- QCD agrees to adopt, and become a party to, the current DPI/Teamsters Local 710 Collective Bargaining Agreement which currently expires on May 31, 2022, except as specifically set forth below:

- All current DPI employees covered by this CBA will be offered employment with QCD, subject to QCD hiring requirements being satisfied

- QCD to recognize Teamsters Local 710 as the exclusive collective bargaining representative for the employees at the former DPI facilities located in Chicago and Indianapolis.

- The former DPI facilities located in St. Louis and Minneapolis will not be covered by the current CBA.

- Effective February 2, 2020, DPI transferees will move from the DPI Health and Welfare Plan to the QCD Health and Welfare Plan, at current QCD premiums

- Effective February 2, 2020, DPI transferees will move from the DPI 401(k) Plan to the QCD 401(k) Plan.

- Upon the expiration of the current CBA, the current bargaining unit will be divided into two separate bargaining units by location, with a separate CBA, with separate expiration dates, for each location (one for Chicago, and one for Indianapolis);

- The Company and Teamsters Local 710 agree to negotiate over the implementation of component pay for drivers in QCD's new Indianapolis location, and to extend the CBA expiration date as it applies to the Indianapolis facility by one year, to May 31, 2023, subject to ratification by the members at that location.

- Displaced drivers servicing St. Louis and Minneapolis may (1) apply for an open position in either Chicago/Indy, with dovetailed seniority and reimbursement of moving expenses not to exceed the severance payable under the current CBA, or (2) receive the severance payable under the current CBA (drivers who apply for, and do not receive an open position in either Chicago/Indy remain eligible for severance pay).

- When QCD Chicago West and QCD Chicago East are established, they will be covered by a single CBA, with separate seniority lists at each facility.

Golden State Foods                    Teamsters Local Union No. 710

_Ed Rodriguez_
Ed Rodriguez
Chief Human Resources Officer

Michael Cales
Secretary-Treasurer

**12/31/19**
Date                                  Date


Quality Custom Distribution

_Peter Fisher_
Peter Fisher

**12/31/19**
Date

# EXHIBIT B

Telephone 773-254-3200

HIGHWAY DRIVERS, DOCKMEN, SPOTTERS, RAMPMEN, MEAT PACKING HOUSE AND ALLIED
PRODUCTS DRIVERS AND HELPERS, OFFICE WORKERS, AND MISCELLANEOUS EMPLOYEES

**LOCAL UNION NO. 710, Affiliated with the I.B. of T.**        9000 West 187th Street, Mokena, IL 60448

Date/Time
Time Clock
Initials _____

_____

Deadlocked
4-27-20

## RECORD OF GRIEVANCE

Date _4-17-20_

Name _John Role_        Address _9000 w 187th st_

City _Mokena_        State _IL_   Zip _60448_   Phone No _773-254-3200_

Email Address _____

Employed By _Teamsters Local 710_        Location _ALL QCD facilities under 710 CBA_

Class of Work _____        Supervisor _____   Length of Service ____ Yrs. ____ Mos.

Articles Violated _4.5_

If this is a Pay Claim, state the number of: Hours _on going_ Miles _____   Total Amount $ _on going_

State Nature of Complaint **(GIVE NAMES, DATES, TIMES, PLACES):**

This is a Agents Protest. On 4-17-20 the Company only paid
its employees 30 hours of pay. Under 4.5 of the CBA the members
a guaranteed 40 hours of pay. The Union asks that the Company
make all of the effected employees (members) whole for all losses.
This protest shall remain in effect until the Company pays its
employees (710 members) their 40 guarantee for any weeks after the
payday of 4-17-20. The work week of 4-5-20 thur 4-11-20 and ongoing

# EXHIBIT C

Before
**PETER R. MEYERS**
Arbitrator

| | |
|---|---|
| In the Matter of the Arbitration between:<br><br>**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 710,**<br><br>                Union,<br>    And<br><br>**QUALITY CUSTOM DISTRIBUTION,**<br><br>            Employer. | FMCS Case No.   **200508-06098**<br><br>Grievance:      **QCD Hours Guarantee** |

## DECISION AND AWARD

**Appearances on behalf of the Union**
    Richard D. Richardson—Attorney
    John Rule—Recording Secretary/Business Agent
    Kenyatta Newson—Class A Driver and Union Stewardess

**Appearances on behalf of the Employer**
    Gregory D. Wolflick—Attorney
    Gus Golembiewski—Central Region Director

This matter came to be heard before Arbitrator Peter R. Meyers on the 29th day of September 2020 via the Zoom videoconference application.  Richard D. Richardson presented on behalf of the Union, and Gregory D. Wolflick presented on behalf of the Employer.

1

## Introduction

The International Brotherhood of Teamsters, Local 710 (hereinafter "the Union"), filed the instant grievance on behalf of all affected employees working within its bargaining unit, alleging that Quality Custom Distribution (hereinafter "the Company") violated the parties' collective bargaining agreement when it imposed an across-the-board reduction in work hours for the top 80% of the bargaining unit, reducing the work hours for these employees below the forty hours per week guaranteed in the Agreement. The Company denied the grievance.

This matter was processed, without resolution, through the contractual grievance procedure, and then came to be heard before Neutral Arbitrator Peter R. Meyers via remote videoconference on September 29, 2020. The parties submitted written, post-hearing briefs, which were received on November 23, 2020.

## Statement of the Issue

Whether the Company violated the parties' collective bargaining agreement when it suspended the contractual forty-hour guarantee and instituted a reduction in work hours to thirty hours per week in April 2020? If so, what shall be the remedy?

## Relevant Contract Provisions

## ARTICLE FOUR – MINIMUM RATE OF PAY

### Section 4.5

> The parties agree that the top 80% of the current Seniority Roster shall be guaranteed 40 hours of work or its equivalent in pay, when reporting for work. The remaining 20% of the current Seniority Roster shall not be guaranteed 40 hours and may be subject to call when needed on a daily basis. All employees shall be guaranteed not less than 8 hours consecutive work or its equivalent in

2

pay (if on a 5 day schedule) or 10 hours or its equivalent in pay (if on a 4 day schedule) when called in or put to work with the exception of the 5th or 6th day, when a minimum daily guarantee of 4 continuous hours shall prevail at time and one-half the hourly rate. In the event of an "Act of God," the Employee shall not be guaranteed 40 hours for that week. The Employer, with a Union Member present, will notify the Employee's to not report to work. In the event there is limited work, available work will be offered in seniority order by classification.

## ARTICLE ELEVEN – RESOLUTION OF GRIEVANCES

### Section 11.4 – Arbitration

If any grievance is not resolved in the manner set forth above, then any such grievance timely processed through the above procedure may be appealed to arbitration by the Union by giving written notice of its desire to arbitrate. Such notices must be presented to the Employer Human Resource designee within ten (10) calendar days of the date of the Employer's answer in Step 3.

The Union shall, within ten (10) calendar days of giving such notice to the Employer, request the Federal Mediation and Conciliation Service to submit a panel of five (5) arbitrators, all of whom are members of the National Academy of Arbitrators. The parties shall select the Arbitrator from that list by alternately striking the names until one name remains. Either party shall have the right to reject the first panel.

Separate grievances may not be joined in a single arbitration except by mutual agreement of the parties.

The Arbitrator shall be bound by the express provisions of this Agreement and shall not have the power to add to or subtract from or modify any of the express provisions of this Agreement, nor create any obligation not expressly intended by the provisions of this Agreement, nor find that any time limited has been waived absent specific written agreement of the parties to such waiver. The Arbitrator's decision consistent with this authority shall be final and binding on the Employer, the Union, and the employees.

The cost of arbitration shall be paid by the loser. Such costs shall include the filing fee, if any, Arbitrator's fee and expenses, transcript, and place of holding the hearing. Each party shall be responsible for compensating its own representative and witnesses.

## ARTICLE SEVENTEEN – MANAGEMENT RIGHTS

Except as otherwise specifically provided in this Agreement or restricted thereby, all of the rights, prerogatives and authority that the Company had prior to the execution of this Agreement are retained by the Company and remain exclusively with the Company. Specifically, but not by way of limitation, the Union recognizes the right of the Company to hire and direct all employees; to determine the necessity for filling a vacancy; to discipline, suspend, or discharge employees for just cause; to assign, supervise and direct the work force; to maintain discipline within the work force; to promulgate and enforce reasonable plant rules; to lay off employees because of lack of work; to schedule the house of the work force; to determine the length of the work week; to determine the types of products and the extent of services that are to be performed at the Company's facilities; to regulate the use and control of all Company equipment and property; to change or modify its operations; to determine the extent to which its facilities shall be used; to continue or discontinue all or any part of its business; to alter or modify the nature of its business or its method of doing business; to establish incentive programs upon consultation with the Union's approval; and generally to control and supervise its operations and to exercise the customary functions of management in carrying out its business.

### Fact Summary

The Company is in the business of providing food-distribution services to national restaurant chains, with Starbucks as its principal customer. During the time period relevant to this matter, the Company operated a single facility within the Chicago area, a facility located in Hodgkins, Illinois. The Union represents a bargaining unit composed of workers in a number of classifications, including drivers who are required to have Class A licenses to operate commercial motor vehicles, helpers who assist the drivers, and warehouse employees. From its Hodgkins facility, the Company distributes products from the upper peninsula of Michigan to Madison and Milwaukee, Wisconsin; Rockford, Illinois; the Quad Cities; and St. Louis, Missouri; as well as the Chicago metro area.

The evidence shows that on March 9, 2020, Illinois Governor J.B. Pritzker issued a disaster declaration for the State of Illinois because of the COVID-19 pandemic. On

4

March 20, 2020, the Governor issued a statewide order that closed non-essential businesses and required residents to remain at home. Because the Company is a food-service distributor, it was exempt from this shut-down order, as were its retail food-service customers. The record shows that on March 20, 2020, the day of the Governor's stay-at-home order, the Company issued a letter to its employees designating them as essential critical infrastructure workers exempt from the stay-at-home order. The record establishes, however, that as the coronavirus pandemic spread within the United States during 2020, Starbucks experienced a drop in demand for its products in the Chicago area, with its sales dropping and some locations closing. As a result of this drop in demand, the volume of products to be warehoused and delivered through the Company's Hodgkins facility also dropped.

The Company continued to operate and kept the Hodgkins facility open during the time period at issue, but the Company determined in March 2020 that it would have to reduce the work hours of its drivers and warehouse employees from forty hours per week to thirty hours per week. In making this determination, the Company asserted that the pandemic constituted an "Act of God" under Section 4.5 of the parties' Agreement. In conjunction with this reduction in work hours, the Company did not lay off any drivers or warehouse employees during the period of April through June 2020. All of the Company's drivers and warehouse employees working at the Hodgkins facility received thirty hours' pay each week and retained their benefits during the April-June 2020 time period. The record confirms, however, that the Company did lay off all of its helpers.

The record indicates that both the Governor of the State of Illinois and the

Archdiocese of Chicago have referred to the pandemic as an "Act of God."

The record establishes that on or about March 26, 2020, the Company notified the Union of its decision to reduce work hours below the forty-hour guarantee set forth in Section 4.5 of the Agreement, citing its assertion that the pandemic was an "Act of God." The Union countered that the pandemic was not an "Act of God," and it insisted that the Company lay off employees in reverse-seniority order and assign forty hours of work per week to the most senior employees. The Union argued to the Company that Section 4.5 of the Agreement required such moves, but the Company refused to follow this course of action.

The evidence demonstrates that on April 1, 2020, the Company notified its employees that effective April 5, 2020, it would be implementing the temporary reduction in work hours to thirty per week.

While employees were working reduced hours, and with the Company's encouragement, some applied for partial unemployment compensation to make up for their lost earnings. The record indicates that none of the affected employees were successful in obtaining unemployment benefits.

The record shows that by early June 2020, the Company's business had rebounded as the pandemic's impact declined. Employees affected by the reduction in work hours were again scheduled for forty hours of work per week pursuant to the guarantee in Section 4.5 of the Agreement.

The Union filed the instant grievance on a unit-wide basis, alleging that the reduction in work hours had violated the Agreement and seeking a make-whole remedy

6

for all affected employees.

**The Union's Position**

The Union initially contends that it has met its burden of proving that the Company violated the Agreement by improperly relying on the "Act of God" exception when it suspended the forty-hour guarantee required under Section 4.5. The Union asserts that because "Act of God" is not defined within the four corners of the Agreement, its meaning must be determined from the parties' intent with respect to this clause, based on evidence of the parties' bargaining history, practice, and other relevant factors. The Union argues that there is no evidence in the record suggesting that the parties intended to afford the term "Act of God" anything other than its customary meaning. The term "Act of God" therefore must be applied in accordance with its customary, general meaning.

The Union maintains that the Company's reliance on the "Act of God" exception to the forty-hour guarantee is not supported by the customary interpretation and application of this term. The Union does not dispute that the pandemic is the sort of calamity that could be encompassed by the term "Act of God," but it submits that this does not settle the issue. The Union insists that the pandemic was not the direct, or even secondary, cause of the Company's suspension of the forty-hour guarantee.

The Union points out that the "Act of God" exception applies only if the event relied upon actually prevented a party from performing its contractual obligations. The Union submits that in this case, the Company's decision to suspend the forty-hour guarantee was not a direct result of the viral outbreak. Instead, the evidence confirms

7

that the Company suffered a temporary loss of business as its food-service customers saw their own sales decrease. The Union contends that the decrease in sales experienced by the Company's customers also was not directly caused by the pandemic. This sales decrease actually was caused by the economic and movement restrictions imposed by the Governor's administration in response to the pandemic. The Union argues that while the pandemic may well be an Act of God, the intervening chain of governmental and economic causes of the Company's loss of business shows that the pandemic was not the proximate cause of the Company's decision to suspend the forty-hour guarantee. Moreover, none of the intervening causes are "overwhelming, unpreventable events caused exclusively by forces of nature" that would qualify as Acts of God.

The Union suggests that the Company is asking the Arbitrator to ignore the difference between events that are merely beyond the Company's control, such as a business slow-down, and a proximate event that qualifies as an Act of God. The Union notes that the Company and its customers are sophisticated business enterprises with the capacity to anticipate market fluctuations and to negotiate clauses apportioning risk into their commercial contracts. The Union emphasizes that a business down-turn is precisely the sort of risk that sophisticated enterprises would anticipate and provide for in their commercial contracts or mitigate through other means.

The Union points out that the Company nevertheless argues that the loss of business volume was itself an unforeseeable and unpreventable event that was caused exclusively by natural events. The Union maintains that the Company's loss of business volume was a result of human decision-making, not natural forces. The Union argues

8

that the Governor chose to implement COVID-19 restrictions, customers chose not to frequent Starbucks and other food-service retailers, and those retailers chose to order less product from their suppliers. The Union also emphasizes that the Company waited two weeks after the Governor's disaster order before it chose to suspend the forty-hour guarantee. This delay in responding to the disaster declaration shows that the loss of business volume was, at that point, no longer unforeseeable.

The Union reiterates that the COVID-19 pandemic was not a proximate cause justifying the Company's suspension of the forty-hour guarantee, and the business slow-down that directly led to the reduction in work hours is not at "Act of God" under the common interpretation and application of that term.

The Union goes on to assert that the Company's conclusory reliance upon the Governor's declaration of an "Act of God" with respect to Illinois educational requirements is similarly misplaced. There is no evidence in the record showing the precise content of the Governor's declaration or the factual findings or analysis that led to this declaration. The evidentiary record therefore does not establish any basis for assessing the differences or similarities between any purported Act of God relating to Illinois schools and to the Section 4.5 exception. Moreover, the Governor's declaration of an "Act of God" relating to education covered the last two weeks of March 2020, ending days before the Company invoked the "Act of God" exception to the forty-hour guarantee. In addition, there is no evidence that the Company's loss of business volume was related to school closures. The Union therefore insists that the Governor's declaration has no bearing on the Company's subsequent independent decision to

suspend the forty-hour guarantee.

The Union argues that it has met its burden of showing that the Company disregarded its contractual obligations by suspending the forty-hour guarantee mandated by Section 4.5 of the Agreement. The instant grievance therefore should be sustained.

The Union goes on to assert that the Company further violated Section 4.5 when it cut work hours across the board, rather than offering work by seniority, as required by the Agreement. The Company simply ignored Section 4.5's mandate that in the event of limited work, available work is to be offered in seniority order by classification. The Company improperly substituted its own judgment for the procedure mandated by the Agreement. The Union also emphasizes that Section 4.5's requirement of a forty-hour week, as well as the other Agreement references to a forty-hour week, demonstrate that the parties intended for available work to be apportioned so as to create forty-hour work weeks for employees based on seniority.

The Union suggests that the Company is asking the Arbitrator to effectively rewrite the final sentence of Section 4.5 so as to grant the Company the discretion to dole out available hours to the bargaining unit in contravention of the plain language of this provision. The Union insists that such a modification would exceed the Arbitrator's authority. The Union notes that the Company's assertions about its motivations for its actions are not relevant to the issue of whether the Company violated Section 4.5, or to the proper interpretation of the plain meaning of the Agreement. The Union also argues that the fact that the Company laid off all of its helpers, costing them their health insurance benefits, undercuts the Company's lofty claim that one reason for the across-

10

the-board cut was that it had a moral obligation to maintain employee health insurance. The Union maintains that this inconsistency demonstrates that the Company's actions were the result of a business decision: the Company wanted to have access to its pool of drivers when sales inevitably rebounded. The Union submits that the Company laid off the helpers because they are easier to replace. The Union insists that the Company should not be permitted to distract from the contractual question at issue by flag-waving and asserting unfounded claims of moral authority. The Union asserts that the parties' Agreement is meaningless if the Company is not held to the bargain that it made.

The Union ultimately contends that the instant grievance should be sustained in its entirety, and an appropriate remedy should be awarded, including an award of back pay to bargaining-unit employees who otherwise would have received their forty-hour guarantee. The Union requests that if the grievance is not sustained with respect to the forty-hour guarantee, then it should be sustained with respect to the Company's admitted failure to apportion work based on seniority, with an appropriate remedy for this violation, including back pay for employees who would have received forty-hour shifts during the operative period if the Company had apportioned available work by seniority.

**The Company's Position**

The Company initially contends that Section 4.5 provides an express exception to the forty-hour guarantee, stating that employees shall not be guaranteed forty hours during a week in which an "Act of God" occurs. The Company asserts that the Union Business Agent agreed that if the pandemic was an Act of God, then the Company had no obligation to guarantee forty hours during the April to June time period at issue. The

11

Company argues that it is hard to imagine a more compelling Act of God circumstance than the COVID-19 pandemic that has stuck the world, closing businesses, causing more than 200,000 deaths in the U.S. alone, and bringing the country to the brink of collapse.

The Company maintains that the pandemic is an "Act of God," as that term ordinarily is defined. The Company notes that arbitrators have found that influenza outbreaks that are widespread are Acts of God for purposes of collective bargaining agreements. The COVID-19 pandemic constitutes an "Act of God" under Section 4.5 of the Agreement because, in accordance with the ordinary definition of that term, the pandemic was due to an extraordinary natural force free of human interference, and because it could not have been prevented by the exercise of reasonable care and foresight. The Company also emphasizes the pandemic's rapid and global spread, by which it crossed into every aspect of the business and medical worlds. The Company insists that it did not behave negligently in any way as it addressed the pandemic. The Company asserts that under the circumstances, with both the State of Illinois and the Archdiocese of Chicago having declared the pandemic to be an Act of God, there can be little question that the pandemic is, in fact, an Act of God that excused the Company from guaranteeing forty hours of work to its employees.

The Company then addresses the Union's alternate claim that Section 4.5 required the Company to offer forty hours of work to each employee based on seniority during the relevant time period and to lay off all remaining employees. The Company argues that the Union's interpretation renders the "Act of God" language meaningless. The Company reiterates that the Union's Business Agent agreed that if the pandemic is an Act

12

of God, then the Company was excused from guaranteeing forty hours of work to all employees. The Company again emphasizes that the pandemic is an Act of God. The Union's interpretation of Section 4.5 is inconsistent and incompatible in that it would excuse the Company from guaranteeing forty hours of work each week in the event of an Act of God, but then require the Company to guarantee forty hours of work for the most senior employees when there is an Act of God.

The Company then points to the last sentence of Section 4.5 and its reference to the availability of "limited work." The Company acknowledges that if there was work for only ten drivers and ten warehouse employees, out of the fifty or more employees in each of these classifications, then the Company would be required to offer the limited work to employees based on seniority. The Company insists that this is not what happened in the instant case. Instead, the Company retained all employees in the Warehouse and Driver classifications, and each of these employees was treated equally and provided with thirty hours of pay, even if they did not perform thirty hours of work within the week. The Company asserts that there was no limited work. Instead, the Company needed all of the drivers and warehouse employees it had in order to service its customers and provide coverage throughout the geographic area serviced by the Chicago facility. The Company acknowledges that there was not enough work to keep all of these employees busy for forty hours per week during the April to June 2020 period. The Company contends that it exercised its judgment in concluding that all of these employees were needed, both in the short-term and in the long-term, to serve customer demands and once the pandemic passed.

13

The Company suggests that the Union wants to substitute its judgment for that of management, and to ask management to guarantee forty hours of work to the most senior employees and lay off the remaining employees. The Company points out that the Agreement's Management Rights Cause does not allow the Union to substitute its judgment for that of management in the circumstances at issue. The Company exercised its management rights and determined that it was necessary to retain all drivers and warehouse employees and to provide them with thirty hours of work each week during the relevant period, along with benefits. This was necessary to meet its employees' need to maintain insurance coverage and the needs of the Company to serve its customers across a broad geographic region.

The Company ultimately contends that the instant grievance should be denied in its entirety.

## Decision

This Arbitrator has carefully reviewed all of the testimony and evidence in the record, as well as the parties' arguments in support of their opposing positions. In this dispute over the proper interpretation and application of the parties' collective bargaining agreement, the Union bears the burden of proving that the Company violated that Agreement when it unilaterally and temporarily reduced work hours for members of the Union's bargaining unit from the contractually guaranteed minimum of forty hours per week to thirty hours per week. This reduction in work hours remained in effect for a period of about two months while the COVID-19 pandemic was spreading and causing a great deal of disruption and damage in this country and throughout the world.

14

There is little disagreement between the parties as to the material facts giving rise to the instant dispute. Section 4.5 of the parties' Agreement provides that the top 80% of the seniority roster shall be guaranteed a minimum of forty hours of work per week or the equivalent in pay. This provision also specifies that in the event of an Act of God, employees shall not be guaranteed forty hours "for that week." This provision further states that in the event of limited work, available work will be offered in seniority order by classification.

As the pandemic began to spread in this country during the early months of 2020, its medical, social, and economic impacts similarly expanded. The record shows that Illinois Governor J.B. Pritzker issued a disaster declaration on March 9, 2020, because of the pandemic's impact. This was followed, on March 20, 2020, by the Governor's issuance of a statewide order that closed non-essential businesses and required residents to remain at home. The evidence confirms, however, that the Company's business operations were exempted from this shut-down order because food distribution was deemed an essential business. Although the Company's business operation was exempt from the Governor's shut-down directive, the Company subsequently did see a reduction in the volume of its business.

On or about March 26, 2020, the Company notified the Union that it deemed the pandemic to be an "Act of God," and that it planned to temporarily reduce the work hours for certain bargaining-unit employees, specifically drivers and warehouse employees, from the Agreement-guaranteed minimum of forty hours per week to thirty hours per week. The Union disagreed with the Company's characterization of the pandemic as an

15

"Act of God," as well as the Company's plan to cut work hours. Despite the Union's objections, the Company notified employees on April 1, 2020, that effective April 5, 2020, it would be implementing the temporary reduction in work hours to thirty per week. This temporary reduction remained in effect until June 2020, when the Company reinstated the forty-hour minimum guarantee for its drivers and warehouse employees. The record confirms that the Company did not lay off any of its drivers or warehouse employees, while it did lay off all employees working as helpers, another bargaining-unit classification.

In addressing the dispute between them, both the Company and the Union have described Section 4.5 of the Agreement as including only one exception to the forty-hour minimum guarantee, the occurrence of an "Act of God." Both sides further agree that because the Agreement does not define this term, "Act of God" must be understood and applied in accordance with its plain and ordinary meaning. An "Act of God" ordinarily is understood to mean a natural hazard outside of human control, something for which no human may be held responsible. This term often is applied to such events as tornadoes or earthquakes. This Arbitrator notes that Section 4.5 expressly states that, "In the event of an "Act of God," the Employee shall not be guaranteed 40 hours for that week." The latter part of this sentence establishes that parties' understanding, similar to the generally accepted understanding, that an "Act of God" typically is a single incident that occurs quickly and without warning. The COVID-19 pandemic, however, is a much different type of phenomenon in that it has been a slow-moving disaster for which the human element has been a major contributing factor.

16

Although the record does indicate that Illinois' Governor declared the COVID-19 pandemic to be an "Act of God," as did the Archdiocese of Chicago, these pronouncements are neither determinative nor relevant here. Neither the Governor nor the Archdiocese characterized the pandemic as an "Act of God" in connection with any interpretation or application of a collective bargaining agreement, or in the context of excusing a party to a contract from fulfilling agreed-upon contractual obligations. Moreover, neither the Governor nor the Archdiocese has any authority to direct whether and how the parties here are required to proceed under their collective bargaining agreement. I hold that the Company's cited declarations by the Governor and the Archdiocese describing the COVID-19 pandemic as an "Act of God" are not relevant to the resolution of the instant dispute.

What is relevant to the instant dispute is whether the circumstances surrounding the pandemic in late March and early April 2020 were such that the pandemic then could be considered an "Act of God," as that term is ordinarily understood and for purposes of the proper interpretation and application of Section 4.5 of the Agreement. There is a general understanding that by the time period at issue here, the pandemic had been allowed to spread globally and affect so many aspects of life because the reactions of governments, public and private institutions, and individuals to the pandemic generally were too little and too late. The spread and negative impact of the COVID-19 pandemic could have been better controlled, but those in authority failed to act quickly and decisively enough. By late March and early April 2020, the pandemic and the damage it was causing no longer could accurately be described as an "Act of God." Instead, a

17

significant part of all of this was the direct result of human action, human inaction, and human error.

The record further demonstrates that even if the pandemic could have been appropriately considered an "Act of God" by late March and early April 2020, any impact on the volume of the Company's business was not a direct result of the pandemic. Instead, much of the general business downturn that occurred during the time period at issue was due to the cascading impact of the general lack of an appropriate and timely response to the virus' emergence that might have limited its spread. By the time that governments and institutions finally did begin to take concrete steps to respond to the virus, the virus already had spread so far that extreme measures had to be implemented to address its effects. These extreme measures were far more directly responsible for the drop in the volume of business that the Company experienced than was the virus itself. Had effective responsive measures been implemented earlier and more broadly, then it is possible that the pandemic's spread could have been curbed and better controlled without the need for the sort of extreme measures that were put in place around and during the relevant time period. All of this was caused and directed by human governments and institutions, and these measures cannot be characterized as natural hazards beyond human control. Again, I find that the Company's business volume was not directly affected by an "Act of God."

The Union is correct that during the time period at issue, the COVID-19 pandemic was not an "Act of God," as that term must be understood both generally and for purposes of interpreting and applying Section 4.5 of the parties' Agreement. As the party

18

invoking the "Act of God" language in defense of its actions, the Company is responsible for bringing forward sufficient evidence to establish the pandemic as an "Act of God," and to establish that this "Act of God" had directly caused the drop in its business volume, but the Company has failed to do so.

The COVID-19 pandemic cannot be deemed an "Act of God" under Section 4.5 of the Agreement under the circumstances that existed at the time that the Company unilaterally reduced the work hours for drivers and warehouse employees below the contractual 40-hour minimum guarantee. The Company therefore cannot rely upon the "Act of God" exception to Section 4.5's guarantee of a forty-hour minimum for employees covered by the parties' Agreement. There is no other basis in the Agreement for any departure from the forty-hour minimum, so I must find that the Company's unilateral decision to temporarily reduce work hours for its drivers and warehouse employees below Section 4.5's guaranteed minimum of forty hours violated the parties' Agreement.

As for any claim that the Company's unilateral action was justified by limited work, which is referenced in the last sentence of Section 4.5, this also fails to support the Company's position. Section 4.5 does not authorize any unilateral reduction in the guaranteed minimum because of limited work. Instead, Section 4.5 explicitly provides that any reduction in work hours below the minimum forty-hour guarantee may occur only in the event of an "Act of God." In the event of limited work, the Company is obligated to offer available work based on seniority. Under this scenario, layoffs may be necessary.

The record indicates that the Company may have been trying to save money on certain expenses in the face of the business downturn while avoiding having to lay off its drivers and warehouse employees, both to preserve their employment benefits and to reduce the risk of losing these valuable and difficult-to-replace employees. These are not unreasonable goals, but the Company must pursue them within the applicable Agreement constraints. Because the record does not support any finding that the drop in the Company's business volume was due to an "Act of God," I hold that the Company had no authority to depart from the forty-hour minimum guarantee provided in Section 4.5 of the Agreement. Its decision to temporarily reduce the work hours of its drivers and warehouse employees to thirty hours per week violated the Agreement.

In light of all of these considerations and in accordance with the clear and unambiguous language of the parties' collective bargaining agreement, this Arbitrator finds that the Union has met its burden of proving that the Company's unilateral actions violated the parties' collective bargaining agreement, as claimed in the grievance at issue. The instant grievance therefore must be, and hereby is, sustained in its entirety. As the appropriate remedy, the Company must make all affected employees whole for all of the compensation that they lost as a result of the Company's improper reduction of their work hours during the April-June 2020 time period.

**Award**

The grievance is sustained in its entirety. The Company violated the parties' collective bargaining agreement when it suspended the contractual forty-hour guarantee and instituted a reduction in work hours to thirty hours per week in April 2020. I order

20

that the Company pay the balance of the forty-hour guarantee to the affected employees who were only paid thirty hours during the applicable period in the spring of 2020.

Pursuant to Section 11.4, since the Company shall be considered the losing party in this case, all of this Arbitrator's fees and expenses as well as the cost of the arbitration shall be paid by the Company.

This Arbitrator shall retain jurisdiction of this matter for a period of ninety days in the event that the parties require the services of this Arbitrator for the purpose of assisting them with the remedy.

PETER R. MEYERS
Impartial Arbitrator

**Dated this 21st day of December
2020 at Chicago, Illinois.**

21